USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  May 19, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X
                              :

JERRY FUND, *et al.*,                :

                              :

                  Plaintiffs,   :      14 Civ. 2958 (KPF)

                              :

             v.             :      <u>OPINION AND ORDER</u>

                              :

CITY OF NEW YORK, *et al.*,     :

                              :

                  Defendants. :

                              :

----------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      Plaintiffs Jerry Fund and the corporation he owns, Automatic Meter Reading Corporation, are respondents in a pending administrative action before the New York City Commission on Human Rights (the "Commission"). They are presently before the Court seeking a temporary restraining order against the Commission: they allege that Defendant Patricia Gatling, Chair and Commissioner of the Commission, made public comments indicating she had prejudged the merits of the allegations against them and, in so doing, made it impossible for them to receive fair consideration from the Commission.  The Court concludes that, pursuant to *Younger* v. *Harris* and *Sprint Communications, Inc.* v. *Jacobs*, it must abstain from considering Plaintiffs' application.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Commission Generally

The Commission exists and is administered pursuant to New York City Administrative Code §§ 8-101 to 8-131.  It consists of nine Commissioners, one of whom, Defendant Gatling, serves as its Chair and is the sole paid Commissioner.  N.Y.C. Admin. Code § 8-103.  The other eight Commissioners are unpaid.  *Id.*  Each Commissioner is appointed by and serves at the pleasure of the Mayor.  *Id.*  Five Commissioners hold master's or doctorate degrees, and three hold law degrees.  (*See generally* Pyatt Decl. ¶ 9).

The Commission can receive complaints filed by aggrieved individuals or file complaints on its own initiative.  N.Y.C. Admin. Code § 8-109.  Regardless of who first files the complaint, the Commission then conducts an investigation into the allegations, a process pursuant to which it has subpoena power.  *Id.* § 8-114.  When an initial complaint is filed by an individual (as opposed to by the Commission itself), the Commission is charged with determining, as a result of its investigation, whether probable cause exists to believe that the

---

[1]    The facts contained herein are taken from the Complaint ("Compl."); the declarations submitted by the parties (cited as "[Name] Decl.") and the exhibits thereto; the factual representations made during the hearing held on May 14, 2014 (the transcript of which is cited as "May 14 Tr."), and the post-hearing submission of Plaintiffs' counsel ("Honig 5/14/14 Letter").  Plaintiffs' brief in support of temporary injunctive relief is cited as "Pl. Br."

alleged misconduct took place.  *Id.* § 8-116.  If so, it refers the complaint to an administrative law judge ("ALJ") for a formal hearing.  *Id.*[2]

Parties referred to an ALJ are subject to rules of procedure that enable them to take discovery and conduct motion practice.  N.Y.C. Admin. Code § 8-117.  Ultimately, a formal hearing on the complaint is held before the ALJ, at which the parties may present testimony and other evidence.  *Id.* § 8-119.  At this hearing, the case in support of the complaint is presented by the Commission's prosecutorial bureau.  *Id.*  The ALJ then issues conclusions of law and proposals for relief in the form of a Report and Recommendation.  *Id.* § 8-120.

The participants in the hearing are both invited to provide comments on the ALJ's Report and Recommendation.  (Pyatt Decl. ¶ 3).  The Commission's Deputy General Counsel then reviews the entire hearing record, as well as the Report and Recommendation, and prepares a proposed final decision and order that takes into consideration the applicable local, state, and federal law, as well as prior Commission determinations.  (*Id.* at ¶¶ 4-6).  The Report and Recommendation, the comments of the parties, and the proposed final decision and order are then submitted to a panel comprising three members of the Commission.  (*Id.* at ¶ 7).  The Chair of the Commission, Commissioner Gatling, is typically a member of the panel, and two other Commissioners are selected at random.  (*Id.*).  Commissioner Gatling's involvement is not, however,

---

[2]     The Commission also has the power to seek amicable resolution of the dispute via conciliation agreement.  N.Y.C. Admin. Code § 8-115.

a precondition to a panel's review of any given Report and Recommendation, and a panel constituted without Commissioner Gatling has undiminished power to issue final decisions and orders.  (*Id.* at ¶ 8).

The three-member panel then reviews the record and proposed decision and order and makes any changes to the proposed decision and order it deems necessary.  (Pyatt Decl. ¶ 10).[3]  If the panel concludes that the alleged discrimination took place, it must state its findings of fact and conclusions of law and issue an order to the accused party to remediate the wrong.  N.Y.C. Admin. Code § 8-120.  This order can require action including, but not limited to, hiring, reinstatement or upgrading of employees, award of back pay and front pay, and payment of compensatory damages.  *Id.*  This constitutes a final order that is subject to review in state court.  Parties may file a "special proceeding" expressly provided in the Administrative Code to review these final orders.  *Id.* at § 8-123.  Parties may also bring an action under Article 78 of the New York Civil Practice Law and Rules.  *See Univ. Club* v. *City of New York*, 842 F.2d 37, 40 (2d Cir. 1988) (explaining that the application of city law by the Commission can be challenged via a state court Article 78 proceeding).

---

[3]     Plaintiffs argue that this paragraph "appears to contain hearsay as to what Commissioners have done or will do."  (Honig 5/14/14 Letter).  The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801.  Paragraph 10 does not refer to statements made outside this proceeding.  It is Pyatt's testimony regarding what he has observed and has done in the past.

### 2.     The Commission Proceeding Giving Rise to this Action

On or about May 4, 2011, an individual named Monica Cardenas filed a complaint with the Commission against Plaintiffs, alleging certain violations of the New York City Human Rights Law, including sexual harassment, gender discrimination, and the creation of a hostile work environment.  (Okereke Decl. Ex. A).  Plaintiffs responded to this administrative complaint, denying any wrongdoing.  (*Id.* at Ex. B).  The parties then submitted documentary evidence to the Commission; the Commission, through its Enforcement Division, conducted an investigation into the complaint.  (*Id.* at ¶ 7).  The parties also participated in a fact-finding hearing before an ALJ involving the presentation of testimony and other evidence.  (*Id.* at ¶¶ 8-9).  After this hearing, the ALJ issued a Report and Recommendation on March 14, 2014, finding in favor of the claimant and assessing back pay, front pay, and damages against Plaintiffs in the total of approximately $294,806 with certain adjustments for interest and present value, and a $75,000 civil penalty to be paid to the City.  (*Id.* at Ex. C).

The complainant and Plaintiffs were notified by letter dated March 25, 2014, that each side had an opportunity to submit comments to the Commission regarding the ALJ's Report and Recommendation by April 14, 2014.  (Okereke Decl. Ex. D).  On March 27, 2014, Plaintiffs requested and received an extension of time to submit their comments until May 15, 2014.  (*Id.* at Ex. E).  This deadline has two consequences: (i) it is the last opportunity for Plaintiffs to submit their comments on the ALJ's Report and

Recommendation, after which such comments will be barred; and (ii) only after this deadline will the Commission begin its review of the ALJ's Report and Recommendation preparatory to issuing a final decision and order.  (*Id.* at ¶ 16; May 14 Tr. 3:7-17).

The *New York Daily News* obtained a copy of the ALJ's Report and Recommendation and contacted Commissioner Gatling to seek her comments for publication.  On March 17, 2014, the *Daily News* printed a story about the matter reporting the following comments attributed to Commissioner Gatling:

> This egregious case of sexual harassment [sends] a clear measure through record damages and a high fine … that this type of activity is illegal in New York City and will not be tolerated….  What the complainant endured over years in order to keep her job is something no one should have to go through or even tolerate.

(Compl. Ex. 1).

## B.   Procedural Background

On April 25, 2014, Plaintiffs filed this action pursuant to 42 U.S.C. § 1983, alleging violations of their rights under the Fifth and Fourteenth Amendments.  (Compl. ¶ 6).  In particular, Plaintiffs allege that Commissioner Gatling's public statements, made before the parties had submitted comments on the ALJ's Report and Recommendation (and, by extension, before the Commission had begun to consider that Report and Recommendation), violated their rights to equal protection and procedural due process by "prejudging" their guilt.  (*Id.* at ¶ 19).  Plaintiffs seek money damages and injunctive relief. (*Id.* at ¶¶ 19, 22).  Of note, Plaintiffs contend that the violations of their rights

created by Commissioner Gatling's statements are so severe that they are "not curable," requiring dismissal of the City administrative action in its entirety. (*Id.* at ¶ 22).

The Complaint was filed with the Court on April 25, 2014, but not served on Defendants until May 1, 2014. (Dkt. #3). Several days later, on May 5, 2014, counsel for Plaintiffs reached out to the Deputy General Counsel of the Commission, Rudolph Pyatt, and requested that the Commission consent to a stay of the pending administrative action "pending the determination" of this litigation. (Honig Decl. Ex. 2). The next day, May 6, 2014, Pyatt responded that the Commission would not consent to a stay. (*Id.*). Pyatt further informed counsel for Plaintiffs that Commissioner Gatling would "play no role in the consideration or decision and order of this case," and that a panel of three other Commissioners would "review the matter and render a decision and order without Commissioner Gatling's input." (*Id.*).

Curiously, given the emergent relief they now seek, Plaintiffs took no further action until May 13, 2014. On that day, Plaintiffs filed a motion with the Court for a temporary restraining order and preliminary injunction, seeking to delay the deadline for their submission of comments and, correspondingly, prevent the Commission from beginning its review of the ALJ's Report and Recommendation. (Honig Decl. ¶¶ 2-3; Okereke Decl. ¶ 16). The Court directed Defendants to respond in writing to this application later that day and held oral argument the following morning, May 14, 2014. At that oral argument, Defendants indicated that the Commission would postpone the May

7

15 deadline to May 22, so that the Plaintiffs would have time to prepare their comments for the Commission's review if injunctive relief were not granted. (May 14 Tr. 49:4-5).

**DISCUSSION**

Plaintiffs contend not merely that Commissioner Gatling cannot act as an impartial arbiter of their liability, but also that all other Commissioners and employees of the Commission are so tainted by her public comments that they must be enjoined from taking *any* action regarding the pending administrative action against Plaintiffs.  Defendants disagree; separately, Defendants argue that *Younger* abstention should prohibit the Court from interfering in the Commission's proceedings.  The Court agrees with Defendants that *Younger* applies here.  Plaintiffs' motion for emergent relief is denied on the grounds of abstention and the Court will not consider its merits of Plaintiffs' application. As *Younger* abstention is mandatory where applicable, *Spargo* v. *New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 75 (2d Cir. 2003), Plaintiffs are ordered to show cause why this action should not be dismissed as detailed in the Conclusion of this Opinion.

**A.   Applicable Law**

**1.   Abstention Generally**

In *Younger* v. *Harris*, 401 U.S. 37 (1971), the Supreme Court articulated "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex Cnty. Ethics Comm.* v. *Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982).

The policy animating abstention, *Younger* explained, derives from

> the notion of comity, that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Younger*, 401 U.S. at 44 (internal quotation marks omitted). *Younger* itself considered the first category in which such extraordinary circumstances have been found: when a state criminal defendant brings a federal action while a parallel, state criminal proceeding remains pending, federal courts must refrain from enjoining the state prosecution.

For some time, the extraordinary circumstances in which it is appropriate for a court to abstain under *Younger* have been considered in light of the factors set out by the Supreme Court in *Middlesex*. *See* 457 U.S. at 432. These factors include: are there ongoing state proceedings; do the proceedings implicate important state interests; and is there an adequate opportunity to raise constitutional challenges in the state proceedings.

Only six months ago, however, the Supreme Court clarified that these factors are not "dispositive," but rather are simply "*additional* factors appropriately considered by the federal court before invoking" *Younger* abstention. *Sprint Commc'ns, Inc.* v. *Jacobs*, 134 S. Ct. 584, 587 (2013) (emphasis in original). *Younger* originally applied abstention in the criminal context, and while the doctrine has expanded outside the criminal context into civil judicial and administrative proceedings, *see Huffman* v. *Pursue, Ltd.*, 420

U.S. 592, 594 (1975), the Supreme Court explained in *Sprint Communications* that abstention is only appropriate in settings bearing some clear procedural relationship to criminal proceedings.  The Court termed these types of cases "quasi-criminal" and explained that, "[d]ivorced from their quasi-criminal context, the three *Middlesex* conditions would extend *Younger* to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest."  *Sprint*, 134 S. Ct. at 593.

Sprint thus held that *Younger* abstention is *only* available in three specific "exceptional" categories of state proceedings, first set out in a prior Supreme Court case, *New Orleans Pub. Serv., Inc.* v. *Council of City of New Orleans*, 491 U.S. 350, 367-68 (1989) ("*NOPSI*").  These categories are: criminal proceedings; civil enforcement proceedings; and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."  *Id.*  The first and third of these categories are clearly not applicable here.  The second is and so the Court will abstain.

### 2.    Civil Enforcement Proceedings: The Second *Sprint* Category

#### a.    As Explained in *Sprint*

 *Sprint* explains that *Younger* only applies to civil enforcement proceedings that are "'akin to a criminal prosecution' in 'important respects.'" *Sprint*, 134 S. Ct. at 592 (quoting *Huffman*, 420 U.S. at 604).  The Supreme Court then enumerated some of the characteristics found in quasi-criminal proceedings:

> Such enforcement actions are characteristically initiated to sanction the federal plaintiff, i.e., the party challenging the state action, for some wrongful act. In cases of this genre, a state actor is routinely a party to the state proceeding and often initiates the action. Investigations are commonly involved, often culminating in the filing of a formal complaint or charges.

*Id.* (internal citations omitted).

*Sprint* sought to explain this second category by citing to a number of prior abstention decisions. Further consideration of two of these cases helps to illuminate why *Younger* applies here. First, in *Middlesex* itself, the Court considered a disciplinary proceeding against a New Jersey attorney. In New Jersey at the time, the state Supreme Court appointed local District Ethics Committees that were responsible for receiving and handling allegations of unethical conduct by attorneys. A member of the committee was assigned to recommend whether probable cause existed to issue a complaint against the accused attorney, a decision that was ultimately made by the chair of the Ethics Committee. A formal statement of charges was then issued to the accused attorney, who had 10 days to answer it. Thereafter, the original investigator was assigned to conduct additional investigation and review, resulting in a determination of whether probable cause existed to believe the unethical conduct had taken place. If so, a formal hearing was held before a panel of the committee, in connection with which the parties could conduct discovery and submit sworn testimony. The panel thereupon issued findings of fact and conclusions. The full committee, on receipt of this report, then either dismissed the complaint, issued a reprimand, or referred the attorney to a

statewide board that could then make recommendations to the state Supreme Court. *Middlesex*, 457 U.S. at 425-30.

As the Supreme Court explained in *Sprint*, this "state-initiated disciplinary proceeding[] against a lawyer for violation of state ethics rules," *Sprint*, 134 S. Ct. at 592, substantiated by a state investigation and the issuance of a formal complaint, was a "'noncriminal proceeding[] bear[ing] a close relationship to proceedings criminal in nature,'" such that it merited deference under *Younger*, *id.* (quoting *Middlesex*, 457 U.S. at 432).

Similarly, in *Ohio Civil Rights Comm'n* v. *Dayton Christian Sch., Inc.*, 477 U.S. 619 (1986), the Supreme Court examined the proceedings of the Ohio Civil Rights Commission ("OCRC"). This body was responsible for allegations of civil rights violations such as, as implicated in *Dayton Christian Schools*, sex discrimination. An individual could file a complaint alleging civil rights violations with the OCRC; in *Dayton Christian Schools*, an aggrieved employee filed an initial complaint of sex discrimination. After initiation, the OCRC would conduct a preliminary investigation. If it determined that probable cause existed to believe that the allegation was true, it would either seek to resolve the dispute amicably via consent order or file a formal complaint against the accused individual or entity and initiate administrative proceedings against that individual or entity; the individual or entity would then be required to file an answer. *Id.* at 623-24.

In *Sprint*, the Court pointed to *Dayton Christian Schools* as an example of "state-initiated administrative proceedings to enforce state civil rights laws,"

involving a state-conducted "preliminary investigation and complaint" that was another example of "an act of civil enforcement of the kind to which *Younger* has been extended." *Sprint*, 134 S. Ct. at 592.

The Supreme Court explained that the Iowa Utilities Board proceeding at issue in *Sprint* itself did not fall into the "civil enforcement action" category for a number of reasons. Unlike the proceedings involved in *Middlesex* and *Dayton Christian Schools*, that proceeding was not akin to a criminal prosecution; it was not initiated by the state, but rather by one private corporation against another; no state authority conducted any investigation, no state actor lodged a formal complaint, and the proceeding as a whole was intended to "to settle a civil dispute between two private parties, not to sanction Sprint for commission of a wrongful act." *Sprint*, 134 S. Ct. at 593. For all these reasons, *Younger* abstention was not appropriate in *Sprint*.

## B.   Application

### 1.   This Proceeding Qualifies for Abstention Under *Sprint*

The proceeding at issue here clearly falls into the second *Sprint* category. Just as in *Middlesex* and *Dayton Christian Schools*, the Commission conducted a formal investigation into the allegations, including employing its subpoena power. (Okereke Decl. ¶ 7). As in both cases, the Commission made a determination based on its investigation that probable cause existed to believe that the alleged misconduct took place. (Honig Decl. ¶ 2). As in *Middlesex*, the Commission then referred the action to an ALJ for a formal hearing. (*Id.*; Okereke Decl. ¶ 8). As in *Middlesex*, the formal hearing before the ALJ allowed

the parties to present testimony and other evidence.  (Okereke Decl. ¶ 9).  As in both cases, the Commission ultimately must decide if the alleged discriminatory practice took place; if so, it must state its findings of facts and conclusions of law and issue an order to the accused party to remediate the wrong.  N.Y.C. Admin. Code § 8-120; (Okereke Decl. at ¶¶ 13-16).  Just as in *Dayton Christian Schools*, this order can require action including, but not limited to, hiring, reinstatement or upgrading of employees, the award of back pay and front pay, and payment of compensatory damages.  (Okereke Decl. ¶ 16).  This decision and order will constitute a final order subject to review in state court.  N.Y.C. Admin. Code § 8-123; *Univ. Club*, 842 F.2d at 40.

There is a plain resemblance between the Commission's proceedings and those in *Middlesex* and *Dayton Christian Schools* that the Supreme Court found in *Sprint* typified the category of civil enforcement actions where *Younger* abstention was appropriate.  In all three cases, the proceedings involve "adjudicative authority ... invoked ... to sanction [the federal plaintiff] for commission of a wrongful act."  *Sprint*, 134 S. Ct. at 593.  All involve action initiated by a state body in its sovereign capacity, subject to a finding of probable cause substantiated by that body's investigation.  All three were, in short, "akin to a criminal prosecution in important respects."  *Id.* at 592 (internal quotation marks omitted).  There can be no question that the category identified in *Sprint* covers the Commission's actions here.

And for good reason: the comity interests underlying *Younger* itself find full expression in abstaining from enjoining the Commission here.  *Younger* is

14

premised on the belief that our federal union will function best if each of its constituent entities is permitted to conduct its affairs in its own way, so long as that conduct does not violate the rights of individuals without affording them the ability to seek relief from that violation.  In a circumstance like this, where a local body seeks to punish alleged violations of its civil rights laws and thus vindicate the value of those laws, *see Dayton Christian Schools*, 477 U.S. at 628, *Sprint* commands that the Court should not interfere.

At oral argument, Plaintiffs argued that the analogy between the Commission proceeding and the proceeding in *Dayton Christian Schools* was flawed, for two reasons.  First, Plaintiffs contended that *Younger* abstention is applicable only to state proceedings and not to the proceedings of local or municipal governments.  (May 14 Tr. 13:24-14:10).  They are wrong both as a matter of precedent and as a matter of analysis.  The Second Circuit has approved the applicability of abstention not only to municipal proceedings, but indeed to the proceedings of the Commission itself.  *Univ. Club*, 842 F.2d 37. And in *NOPSI*, 491 U.S. 350, the Supreme Court considered the applicability of *Younger* to the proceedings of the New Orleans City Council; though *NOPSI* found that *Younger* did not apply in that setting, its conclusion was based on the particular traits of the proceeding, not on its municipal character.  *Id.* at 369-71 ("Respondents' case for abstention still requires, however, that the [New Orleans City] Council proceeding be the sort of proceeding entitled to *Younger* treatment. We think it is not.…  The Council's proceedings in the present case were not judicial in nature … [but rather] plainly legislative.").

15

Nor is there any analytical reason for *Younger* not to apply.  Counsel for Plaintiffs suggested at oral argument that *Younger* is founded on federalism interests and so has no vitality as to municipal proceedings.  (May 14 Tr. 14:1-4).  But *Younger* explains itself differently.  In *Younger*, the Supreme Court announced that abstention is motivated by the "vital consideration" of "comity" and "proper respect" for letting separate governments "perform their separate tasks in their separate ways."  *Younger*, 401 U.S. at 44.  Though this rationale was there and often elsewhere an expression of respect for state governments, there is no reason to presuppose that state institutions warrant "proper respect" for the performance of their "separate tasks," while federal courts should have no hesitation to interfere with the affairs of the independent governments of municipalities.  And courts have often concluded just the opposite: that city proceedings are equal candidates for *Younger* abstention.  *Univ. Club*, 842 F.2d 37.

Second, Plaintiffs argued that *Dayton Christian Schools* is inapposite here because the Supreme Court in that case concluded that permitting the state process to proceed risked no constitutional violation.  (May 14 Tr. 17:5-17).  It is true that *Dayton Christian Schools* concluded that the OCRC would "violate[] no constitutional rights by merely investigating the" alleged misconduct.  *Dayton Christian Schools*, 477 U.S. at 628.  But the Court also explained that it had "repeatedly rejected the argument that a constitutional attack on state procedures themselves 'automatically vitiates the adequacy of those procedures for purposes of the *Younger-Huffman* line of cases.'"  *Id.* (quoting *Moore* v. *Sims*,

16

442 U.S. 415, 426 n.10 (1979)).  It was not the constitutional risk posed by the proceeding, but the fact that the School would "receive an adequate opportunity to raise its constitutional claims," that made abstention appropriate.  *Id.*

Far more importantly, Plaintiffs' effort to distinguish *Dayton Christian Schools* fundamentally misunderstands the impact of *Sprint* on *Younger* analysis.  *Sprint* says, in effect, that *Younger* abstention is only available for certain categories of proceedings that share specific characteristics.  How those categories interact with the older multi-factor analysis articulated in *Middlesex* is discussed further below.  But *Sprint* held that whether and what kind of constitutional injury is at risk in a proceeding is at most a secondary question, relevant only after a given proceeding has been located inside one of the permissible categories.  As explained above, the Commission's proceedings share all the salient characteristics *Sprint* identified in *Middlesex* and *Dayton Christian Schools* that positioned those cases inside the second *Sprint* category. This conclusion ends the *Sprint* analysis: this proceeding qualifies for *Younger* abstention.

### 2.    This Proceeding Also Satisfies the *Middlesex* Factors

*Sprint* is, of course, very new law and it remains to be seen whether the category approach it announces will continue to function in concert with the three factors the Supreme Court previously laid out in *Middlesex*, as *Sprint* indicates is its goal, or will in time simply supplant those factors.  *See, e.g.*, *Neroni* v. *Becker*, No. 13-263, 2014 WL 657927, at *1 (2d Cir. Feb. 21, 2014)

(summary order) ("While this appeal was pending, however, the Supreme Court rejected [the *Middlesex*] three-part test in favor of a categorical approach. *See Sprint Commc'ns, Inc.* v. *Jacobs*, 134 S. Ct. 584, 591, 593 (2013)."). Given the shifting state of the law in this area, the Court considers it appropriate to take *Sprint* at its word and treat the *Middlesex* factors as additional, albeit not dispositive, factors to be considered before invoking *Younger*. *Sprint*, 134 S. Ct. at 593. This is appropriate where, as here, the Court has already decided that the civil enforcement action at issue falls comfortably within the "quasi-criminal" context *Sprint* identified as indispensable to the validity of the *Middlesex* factors. *Id.*

The Commission's proceeding satisfies the *Middlesex* factors as well. First, there is no question that there is an ongoing state proceeding: its pendency is the very reason for Plaintiffs' application for emergent relief. Second, the Supreme Court held in *Dayton Christian Schools* that there was "no doubt" that enforcing civil rights laws like anti-sex discrimination statutes was an important state interest for abstention purposes. 477 U.S. at 628. Plaintiffs do not suggest otherwise.

The only *Middlesex* factor at issue is whether Plaintiffs have "an adequate opportunity in the state proceedings to raise constitutional challenges." *Middlesex*, 457 U.S. at 432. Plaintiffs contend that comments of Commissioner Patricia Gatling bespeak prejudgment of the issues and, worse yet, that her public prejudgment has so tainted the proceeding against them that they have "no possibility of a fair hearing" before the Commission. (Pl. Br. 8). "[T]he

18

burden on this point rests on the federal plaintiff to show 'that state procedural law barred presentation of [their] claims.'" *Pennzoil Co.* v. *Texaco, Inc.*, 481 U.S. 1, 14 (1987) (quoting *Moore*, 442 U.S. at 432).  Plaintiffs have failed to do so, for three reasons.  First, they have presented no argument at all to explain what obstacle prevents them from airing their due process challenges to the Commission's consideration of the complaint against them; they merely insist that the Commission is so contaminated, root to stem, by the public comments of one individual that any action it takes will necessary violate their due process rights.  This does not constitute a bar to raising constitutional claims. As noted above, the Supreme Court has "repeatedly rejected the argument that a constitutional attack on state procedures themselves 'automatically vitiates the adequacy of those procedures for purposes of'" *Younger* abstention.  *Dayton Christian Schools*, 477 U.S. at 628 (quoting *Moore*, 442 U.S. at 426 n.10).

It is true, as Plaintiffs pointed out at oral argument and as Defendant conceded (*see* May 14 Tr. 43:1-44:20), that regulations limit the Commission, when reviewing the Report and Recommendation of an ALJ, to consider only comments relating to the record of the hearing before the ALJ.  This limitation means that the Commission may not entertain arguments from Plaintiffs about its own constitutional competence to consider Plaintiffs' case.  This does not, however, amount to a procedural bar on Plaintiffs' ability to raise such constitutional claims.  Plaintiffs are permitted to appeal any final decision of the Commission in state court, either under New York City Administrative Code § 8-123 or under Article 78.  In either case, Plaintiffs could contend that the

Commission's decision constituted an unconstitutional violation of their due process rights.

The Supreme Court has never squarely confronted the question of whether subsequent state court review of administrative proceedings constitutes a single, "unitary process that should not be disrupted, so that federal intervention is no more permitted at the conclusion of the administrative stage than during it." *NOPSI*, 491 U.S. at 369.  Nonetheless, in *Sprint* and *NOPSI* the Court has twice "assume[d], without deciding, that" subsequent state court review of administrative proceedings does count as a "unitary process for *Younger* purposes."  *Sprint*, 134 S. Ct. at 592 (internal quotation marks omitted); *see also NOPSI*, 491 U.S. at 369.  It is the fairest reading of these cases that when state or local administrative proceedings are subject to state-court review, it is not appropriate for a federal court to interfere in the dispute until the federal plaintiff has exhausted the possibility of remedy in state court.  (*See* May 14 Tr. 28:5-10).  Even if the Supreme Court eventually determines otherwise, it nonetheless remains true, as *Dayton Christian Schools* recognized, that the fact that "constitutional claims [could] be raised in state-court judicial review of the administrative proceeding," *Dayton Christian Schools*, 477 U.S. at 629, satisfies *Younger*'s requirement that plaintiffs have the opportunity to make their constitutional arguments in the state proceeding. As the Second Circuit has found in an analogous thread of *Younger* analysis, "where such state remedies are available, 'a federal court should assume that state procedures will afford an adequate remedy, in the absence of

unambiguous authority to the contrary.'" *Diamond "D" Const. Corp.* v. *McGowan*, 282 F.3d 191, 202 (2d Cir. 2002) (quoting *Pennzoil*, 481 U.S. at 15). The express access to the courts provided Plaintiffs in local and state law leaves them without an argument that federal court review is necessary to safeguard their constitutional rights.

Finally, the best explanation of why Plaintiffs face no bar to presenting their due process claim regarding Commissioner Gatling's public comments to the Commission is that they have already done so — and prevailed.  The Commission has explained that only three of the multiple members of the Commission need review any case to render a final decision and order, and that Commissioner Gatling will "play no role in the consideration or decision and order of" Plaintiffs' case before the Commission.  (Honig Decl. Ex. 2). Irrespective of the merits of their claims, Plaintiffs have already won.

Plaintiffs view Commissioner Gatling's recusal in a different light.  In their estimation, the Commission has effectively acknowledged the Commissioner's wrongdoing, and her wrongdoing is so severe that the whole Commission is equally tainted.  (Def. Br. 3).  Neither claim is correct.  First, the Commission has by no means confessed the wrongfulness of Commissioner Gatling's comments, as her noninvolvement could just as easily be explained as a prudent response to Plaintiffs' claims of constitutional violation, made without respect to the correctness of those claims.  And the fact that the Commission accepted Plaintiffs' objections and altered its procedures to accommodate those objections (May 14 Tr. 45:3-9), is conclusive proof that

Plaintiffs could not only present their constitutional complaints to the Commission, but even succeed on them.

Second, Plaintiffs have already won the only appropriate cure in cases of prejudgment in administrative adjudication.  There is a plain, sensible, and time-honored remedy for such wrongs: recusal of the officer who prejudged the issue.  The leading case on this question is *Cinderella Career & Finishing Sch., Inc.* v. *F.T.C.*, 425 F.2d 583 (D.C. Cir. 1970) ("*Cinderella*").  There, the Chairman of the Federal Trade Commission ("FTC") made a speech at a public event while an appeal was pending; in the speech he clearly indicated his judgment on how the issues in the appeal should be resolved, without referring to the parties by name.  *Id.* at 589-90.  He then participated in consideration of the appeal.  *Id.* at 589.  The D.C. Circuit held that this was grounds for reversal and remand.  *Id.*  Adopting a standard first articulated by the Second Circuit, the D.C. Circuit explained that the test for disqualification in these circumstances is "whether 'a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.'"  *Id.* at 591 (quoting *Gilligan, Will & Co.* v. *SEC*, 267 F.2d 461, 469 (2d Cir. 1959)) (alteration in *Cinderella*).  The Chairman's speech failed this test; his involvement in the proceeding consequently amounted to a denial of due process, even though the result would have been unchanged without his vote.  *Id.* at 591-92.  The D.C. Circuit ordered the case remanded and reheard without the Chairman's participation.  *Id.* at 592.

The noninvolvement of Commissioner Gatling here resolves Plaintiffs' claim of injury whether Plaintiffs are right or wrong.  Indeed, it is the best result they could have hoped for, even had they ultimately prevailed on the merits.  Plaintiffs have offered no indication that any other Commissioner has displayed any form of bias or prejudgment.  And Plaintiffs clarified at oral argument that their complaint in this action relates solely to "the occurrences involving Commissioner Gatling." (May 14 Tr. 5:1-2).  The Commissioner's remarks might be enough to persuade a disinterested observer of her prejudgment of these matters, though given the Court's decision that it must abstain the Court will not decide that question.  But there is certainly no indication that Gatling's comments were intended or will function as express directives to the other members of the Commission, binding their decision even without her involvement.  *See Stadium Motors, Inc.* v. *New York City Dep't of Consumer Affairs*, No. 07 Civ. 3120 (CPS), 2007 WL 2288040, at *3-4 (E.D.N.Y. Aug. 8, 2007) (rejecting argument that public comments of the Commissioner of the New York City Department of Consumer Affairs would "influence his direct subordinates" without his involvement).

Plaintiffs made several attempts in their brief and at oral argument to suggest that it was not enough for them to have won a remedy already.  None succeeds.  First, Plaintiffs argued that the other Commissioners are assigned to "assist" Commissioner Gatling, citing to the Commission's website, and so are poisoned by the same prejudgment that she evinced in public; it is impossible, Plaintiffs argue, that a panel of three Commissioners would ever depart from

23

the view Commissioner Gatling expressed.  (Pl. Br. 3, 7; *see also* May 14 Tr. 9:24-10:1, 10:23-11:1, 34:1-5).  For this reason, in their view, this case is totally unlike *Cinderella*: in particular, Plaintiffs argue that FTC Commissioners, unlike the Commissioners here, are co-equal officials over whom the FTC Chair exercises no influence.  (May 14 Tr. 9:18-24).  Because the Commissioners here are so dominated by Commissioner Gatling's influence, Plaintiffs submit, *Cinderella* is inapposite and its remedy insufficient. (*Id.* at 10:1-4, 10:23-11:1).

Even assuming, without accepting, that Plaintiffs correctly accuse Gatling of prejudgment, there is no indication that any other individual has impermissibly formed an unalterable opinion of the proper outcome without affording the parties appropriate process.  Nor do Plaintiffs correctly characterize the legal organization of the Committee.  Each Commissioner is appointed independently by the Mayor, *see* N.Y.C. Admin. Code § 8-103, and can only be removed by the Mayor.  (Pyatt Decl. ¶ 9).  There is no structural reason to believe that Commissioner Gatling's remarks will wield undue influence over other Commissioners assigned to consider Plaintiffs' case.  Nor were Commissioner Gatling's remarks such that "they were either meant or will be interpreted as implicit or explicit instructions to those charged with adjudicating the matter."  *Stadium Motors*, 2007 WL 2288040, at *4.  Even if Plaintiffs had won on their claims, they would have done no more than prove that this case is exactly like *Cinderella*.  Its remedy is the only remedy Plaintiffs could ever have obtained.  They have already done so.

24

Second, Plaintiffs argue that, irrespective of whether the Commissioners will avoid Commissioner Gatling's pernicious influence, their education and experiences do not permit them to assess the complex legal issues in the case; only Gatling, an attorney (May 14 Tr. 11:5-6), has the capacity to do so, and in her absence the panel will be at sea. (Def. Br. 4 n.1; Honig Decl. ¶ 6; May 14 Tr. 10:10-13 ("There is no way that people [who] would have no legal training … could possibly do due [process] in connection with [these] matters."), 34:5-9). In point of fact, several of the other Commissioners are attorneys and numerous others hold advanced degrees. (Pyatt Decl. ¶ 9). But even if every Commissioner had no more than a grade-school education, Plaintiffs' argument would be no more availing. There is no legal requirement that federal judges must hold law degrees; the fact that all do is no argument that a law degree is indispensable to assessing legal claims. If it is Plaintiffs' contention that the composition of the Commission inherently violates due process because only attorneys could conduct its business fairly, they are free to make that complaint in the proper forum. They have not done so here (May 14 Tr. 4:23-5:2), and they may not do so in the face of the Court's decision to abstain.

Plaintiffs further suggest that it "strains credibility" that "non-salaried, volunteer Commissioners actually review hearing records or legal discussion to formulate an independent view." (Honig 5/14/14 Letter). Plaintiffs offer no evidence to substantiate what seems to be their suggestion: that the Commission is a farce, its proceedings staged, and its orders no more than an expression of the dictatorial judgment of its Chair. The New York City

25

Administrative Code provides otherwise by empowering the Mayor to appoint co-equal Commissioners, each exercising equal influence in assessing and approving final decisions and orders.  N.Y.C. Admin. Code § 8-103.  (Pyatt Decl. ¶¶ 8, 10).  If indeed no Commissioner other than Gatling ever participates in the Commission's work, the composition of the Commission is a mysterious waste of City resources, and both the representations of defense counsel at oral argument and the sworn testimony of the Commission's Deputy General Counsel contain numerous fabrications.  In the absence of any evidence to the contrary, the Court will accept the facts provided about the Commission's conduct of its affairs.  Accordingly, there is no defect in the approach the Commission has taken to reviewing Plaintiffs' case.

Finally, Plaintiffs argue that, without regard to the involvement of other Commissioners in hearing their case, the involvement of Deputy General Counsel Pyatt "would … in effect" amount to the "continued involvement of Commissioner Gatling" because his immediate superior, the Commission's General Counsel, reports directly to Commissioner Gatling.  (Honig 5/14/14 Letter; *see also* May 14 Tr. 10:19-22 ("And that … is no curative process at all. It's akin to having a person's child or alter ego engaged in the process in place of the person who's not impartial.")).  This argument amounts to the proposition that prejudgment by an agency head necessarily renders all of the agency's employees unfit to participate in any fair evaluation of Plaintiffs' case: because Gatling's subordinate's subordinate would play a role in the formulation of the Commission's final decision and order, Commissioner

Gatling remains "intimately involved in the review process," regardless of whether she actually participates in that process.  (*Id.*; May 14 Tr. 32:9-9-12 ("It is Gatling who was determining it whichever one it is because they're one and the same for all practical purposes given the reported hierarchy that they simply are her people....")).

If Plaintiffs are right, *Cinderella* must be wrong: there, the FTC Chair's prejudgment should have left the entire staff of the FTC incapable of participating in the review process in any way.  Such a rule would obviously sweep much too far.  It would be one thing, as the *Stadium Motors* case observes, if an agency head's comments could fairly be interpreted as "implicit or explicit instructions" to her subordinates.  2007 WL 2288040, at *4.  That is not the case here and Plaintiffs do not argue otherwise.  Even if Plaintiffs are right that Gatling impermissibly prejudged their case, an issue on which the Court makes no judgment, it is not enough to say that Commission staff will necessarily parrot the public views of their superior's superior.[4]  The remedy for such public views, when they draw too close to a specific pending dispute, is to preclude the individual whose impartiality is compromised from adjudicating the dispute.  Thus the Commission has cured Plaintiffs grievance without obliging Plaintiffs to litigate their objections at all.

---

[4]     Notably, by the same reasoning, if the Chief Justice of the United States recused himself from a case due to past involvement or pecuniary interest, then the Supreme Court itself should be forbidden from hearing the case because its personnel would all share his bias.  This is obviously not the rule in such circumstances.

Even if none of the above were true, however, the fact remains that proceedings before the Commission may be further litigated in state court via either a special proceeding pursuant to New York City Administrative Code § 8-123, or pursuant to Article 78 of the New York Civil Practice Law and Rules. The explicit provision of state court remedies for any grievances regarding the Commission's procedures is yet another, unanswerable illustration of the simple fact that Plaintiffs face no procedural bar to raising their constitutional claims outside federal court.  "[W]here such state remedies are available, 'a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary.'" *Diamond "D,"* 282 F.3d at 201 (quoting *Pennzoil*, 481 U.S. at 15).

The proceeding here satisfies the *Middlesex* factors.

### 3.    No Exception to *Younger* Abstention Is Available

No exception to *Younger* abstention applies.  *Younger* explained that federal courts may entertain claims from which they should otherwise abstain when a plaintiff shows "bad faith, harassment, or any other unusual circumstance that would call for equitable relief."  *Younger*, 401 U.S. at 54. There is no indication of bad faith or harassment on the part of the Commission.  At oral argument, Plaintiffs suggested that the requirement that they submit to an unfair tribunal constitutes "per se" bad faith.  (May 14 Tr. 15:5-12).  This argument categorically misunderstands the nature of the *Younger* bad faith exception.  It is also wrong.  First, the bad faith exception focuses on "the subjective motivation of the state authority in bringing the

28

proceeding." *Diamond "D,"* 282 F.3d at 199.  To invoke the bad faith exception,
"the federal plaintiff must show that the state proceeding was initiated with
and is animated by a retaliatory, harassing, or other illegitimate motive." *Id.*  A
contested "proceeding that is legitimate in its purposes, but unconstitutional in
its execution — even when the violations of constitutional rights are
egregious — will not warrant the application of the bad faith exception." *Id.*
Plaintiffs' argument, even if correct, amounts to no more than the latter and
thus cannot show bad faith under *Younger*.

Second, Plaintiffs cannot claim that they are being forced to submit to an
unfair tribunal.  As set out at length above, Plaintiffs have offered no evidence
beyond conclusory assertions and guilt-by-association at multiple degrees of
removal to suggest that they will face unfairness or bias from the Commission.
Even if Gatling's public comments were found to rise to the standard invoking
a remedy under *Cinderella*, Plaintiffs have not and cannot demonstrate a
constitutional violation because they have already received the only remedy
their claims could have received.

Nor do any unusual circumstances exist here.  The Supreme Court has
offered two examples of what might fall into the latter category: when a statute
is "'flagrantly and patently violative of express constitutional prohibitions in
every clause, sentence and paragraph, and in whatever manner and against
whomever an effort might be made to apply it,'" *Younger*, 401 U.S. at 53-54
(quoting *Watson* v. *Buck*, 313 U.S. 387, 402 (1941)), and "when the state
administrative agency 'was incompetent by reason of bias to adjudicate the

issues pending before it,'" *Diamond "D,"* 282 F.3d at 201 (quoting *Gibson* v. *Berryhill*, 411 U.S. 564, 577 (1973)).

Though Plaintiffs contend that the proceedings against them violate their constitutional rights, they do not — nor could they — claim that the anti-discrimination law at issue is itself unconstitutional. And though Plaintiffs undoubtedly insist that the Commission is so biased against them as to foreclose any chance at a fair hearing, they have offered no reason whatsoever to believe that that is so except for their allegations against Commissioner Gatling. As discussed above, Commissioner Gatling's noninvolvement obviates such a claim. Nor is this a case, as the Second Circuit has discussed, where there is no state remedy "to meaningfully, timely, and adequately" resolve the alleged constitutional violation, and "the litigant will suffer 'great and immediate' harm if the federal court does not intervene." *Diamond "D,"* 282 F.3d at 201 (quoting *Trainor* v. *Hernandez*, 431 U.S. 434, 441-42 (1977)). On the contrary, Plaintiffs have already received a remedy for their alleged harm from the Commission. In light of that remedy, Plaintiffs face no harm at all. And to the extent that this remedy proves feigned or inadequate, they can vindicate any subsequent injury via a special proceeding under New York City Administrative Code § 8-123 or a state court action under Article 78. "[W]here such state remedies are available, 'a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary.'" *Id.* (quoting *Pennzoil*, 481 U.S. at 15).

**CONCLUSION**

The Court must abstain from Plaintiffs' application for a temporary restraining order.  As *Younger* abstention is mandatory, *Spargo*, 351 F.3d at 75, Plaintiffs are hereby ORDERED to show cause within 30 days of the entry of this Order why their Complaint should not be dismissed.  Defendant may, if it so chooses, file a response within 15 days thereafter.  *See Woodfin Suite Hotels, LLC* v. *City of Emeryville*, No. C 07-1719 (SBA), 2007 WL 1288397, at *7 (N.D. Cal. May 2, 2007).

SO ORDERED.

Dated:      May 19, 2014
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge